**HOPKINS v GUARDIAN TRUST CO et**

Ohio Appeals, 8th Dist, Cuyahoga Co

No 13008. Decided April 10, 1933

Newcomb, Newcomb and Nord, Cleveland, for plaintiff.

Thompson, Hine and Flory, Cleveland, for defendant The Guardian Trust Company.

John W. Bricker, Attorney General, Columbus, and Charles F. Ohl, Assistant Attorney General, Youngstown, for defendant.

## OPINION

By LEVINE, J.

If the paper writing entitled "Memorandum of Agreement" were to be studied by its own four corners but one conclusion could be reached. There are mutual obligations entered into by and between the contracting parties. Mr. and Mrs. Griffiths, denominated parties of the first part have purchased for the benefit of Mr. Hopkins,

denominated the second party, 570 shares of the stock of The Buckeye Engine Company at $350 per share. Same was placed in the name of The Guardian Savings and Trust Company. The second party (meaning Mr. Hopkins) has the right to pay for the stock and have the same transferred to him or to his order, upon payment to The Guardian Trust Company at the rate of $350 per share with interest, and also on payment of all charges. All dividends paid on account of the shares are to be held by the first parties and by them applied to the payment to be made therefor by the second party. The second party obligates himself:

(a) To save the first party harmless from any and all further obligations on account of the said stock.

(b) To pay interest and all charges due on the same whenever the same shall accrue.

(c) To pay the entire balance due the first parties at any time upon * * * notice of their desire to have such payment made.

It was claimed that this instrument in writing merely amounted to an option permitting Mr. Hopkins to have the stock upon certain payments for same, and that since no time was specified for the exercise of such option and in view of the lapse of time no further claim can be based upon said instrument in writing.

We cannot agree with such claim because of the fact that the second party in addition to other obligations agrees to pay the entire balance due the first parties at any time upon notice of their desire to have such payment made.

The paper writing must be read as a whole and reading it as a whole the mutual obligations of the respective parties are therein set forth and constitute, in our opinion, a sufficient consideration to support the binding effect of these mutual obligations. A binding contract continues in effect until

(1) There was a full performance of the obligation therein set forth.

(2) Until there was a discharge from said obligations by mutual consent.

(3) That the party seeking to enforce the obligations of the contract was guilty of such conduct as to call for the application of the doctrine of estoppel.

We shall proceed to apply this test to the case at bar.

First: Were the obligations of the contract performed?

There is no claim to that effect. Mr. Hopkins at no time called for a transfer of his stock to his name, nor did he offer to pay for same. Mr. and Mrs. Griffiths at no time gave notice to Mr. Hopkins of their desire to have such payment made for said stock. The reason for this state of affairs is quite apparent. This memorandum of agreement entered into between the parties was merely one of the instrumentalities resorted to by Mr. Griffiths to effect liquidation of the stock of The Buckeye Engine Company and to enable him to carry out his personal obligation which was to sell the stock of The Buckeye Engine Company to The E. W. Bliss Company.

Second: Was there a mutual discharge of the obligations of this contract by agreement of the parties?

There is no evidence to this effect excepting as may be gathered from the circumstances.

Was the conduct of the parties such as to invoke the application of the doctrine of estoppel?

There is no direct evidence pointing to inequitable conduct on the part of either of the parties to the contract including Mr. Hopkins, excepting the charge of his failure to exercise reasonable diligence by way of enforcing the benefits accruing to him under the contract.

Addressing ourselves to the binding effect of the contract and upon which this action is predicated, the mere fact that this contract entered into between the parties was a device resorted to by Mr. Griffiths to effect his own purpose and to serve his own ends in bringing about a liquidation of the assets of The Buckeye Engine Company and enabling him to carry out his obligation to The E. W. Bliss Company does not, in our opinion, change the binding effect of this contract. Generally speaking, conversations had by and between contracting parties prior to the execution of a written contract are inadmissible in evidence, as all of the negotiations, conversations and transactions had between the parties prior to the execution of the contract are deemed to be merged in the final understanding reached by them which is evidenced by the paper writing.

It is true that a conversation had between parties to a contract simultaneously with the entering into of the contract to the effect that this writing shall not be binding upon either of them is admissible in evidence and controlling as to the binding effect of the contract. The evidence, however, does not disclose any such conversation. We, therefore, have before us an instrument in writing obligating the con-

tracting parties to definite duties and obligations under the same. This binding contract continues to be binding unless something occurred subsequent to its execution either by way of express or oral modification, or by the application of the doctrine of estoppel based upon the conduct of the parties. An examination of the record discloses that there was no modification of the contract by mutual consent. The most that could be said is that Mr. Hopkins acceded to the request of Mr. Griffiths that the final accounting under the agreement of August 16th, 1920, between Griffiths and Hopkins, was to be postponed until all tax matters were settled and until The Buckeye Engine Company got into a position to be finally liquidated.

It will be noticed that the contract furnishing the basis of this action contains no time limit for performance. Generally speaking, where no date of performance is set, the law attaches an intention of the parties that the same is to be performed within a reasonable time. This presumed intention, however, is not a conclusive legal principle and will never arise if it is contrary to the manifest intention of the contracting parties. Considering the surrounding circumstances of this case, it becomes apparent that the parties did not intend to set any particular date as the date of final performance under the contract.

Some mention was already made of the transaction between The Bliss Company and Mr. Griffiths. It is well to point out that by this transaction The Bilss Company was called upon to make payments to The Buckeye Engine Company over a period of years, the last and largest of which payment was made in 1925. There was also a period of litigation and extensive negotiations of tax questions between The Buckeye Engine Company and the Government. We believe that the record fairly supports the conclusion that all these extended over a period of many years and were not concluded until July of 1931. It seems, therefore, that time not only was not of the essence of this contract, but it is also clear that no particular time was agreed upon between the parties as it was their purpose to take all the time needed until the transaction between The Bliss Company and The Buckeye Engine Company was fully consummated. With the exception of the subsequent agreement between Mr. Griffiths and Mr. Hopkins as to extension of time cf settlement, there is nothing in the record tending to show any negotiation concerning any other terms found in the contract.

Much stress has been laid upon the conduct of Mr. Hopkins in not insisting upon a settlement under his contract until many years have elapsed and until after the death of Mr. Griffiths. The inference sought to be drawn from Mr. Hopkins' conduct is not only to cast doubt upon the circumstances surrounding the entering into the contract, but also upon his veracity and honesty of purpose. As the defense would have it, this court would be required substantially to find that the original contract entered into between the parties was not for the purpose of fixing any rights or obligations under it so far as the contracting parties are concerned, but that it was a mere shell, a mere form without substance, a mere device of Mr. Griffiths to effect a purpose of his own. The court would be required also to find that it was not the intention of the parties that any of them should be held to any obligations or to derive any benefits. Likewise the court would be required to find that the reason Mr. Hopkins waited as long as he did to assert his rights under the contract was because he did not dare to assert them during the lifetime of Mr. Griffiths, but that as soon as Mr. Griffiths died, Mr. Hopkins then felt it safe to assert himself.

The record is brimful with descriptive matter showing the intimate relationship and close friendship between Mr. Griffiths and Mr. Hopkins. Therein are told a number of instances when Mr. Griffiths rendered financial assistance to Mr. Hopkins by making advances or otherwise.

Should the court agree with the defendants' contention and make the findings as requested by the defense, it would be the equivalent of saying that the plaintiff is not only guilty of fraud and dishonesty, but also that he is guilty of ghoulish acts seeking to rob the estate of his best friend. This serious indictment is not justified by the evidence adduced.

The plaintiff is well known in this community and has occupied the highest position of trust within the gift of the people. This court is unwilling to cast such a serious aspersion upon his character without clear and convincing evidence supporting the accusation.

When one analyzes the various contentions as to the basic facts of this case, the conclusion must be reached that there is hardly any dispute concerning the facts. The dispute occurs only as to the purpose of these transactions had between Mr. Hopkins and Mr. Griffiths, the defense maintaining that it was not the intention of the

parties to effect binding obligations, nor to afford any benefits to either of the contracting parties. The plaintiff maintains that while it is true that the contract entered into between the parties was merely a device of Mr. Griffiths to serve his own purpose by way of effecting a liquidation of the assets of The Buckeye Engine Company and to enable him to carry out his own personal obligation to The E. W. Bliss Company which was to sell to it the assets of The Buckeye Engine Company, nevertheless it was the purpose of Mr. Griffiths to confer definite benefits upon Mr. Hopkins if any were to accrue.

It is expained by Mr. Hopkins, and there is nothing to controvert the explanation, that Mr. Griffiths in order to acquire seventy-five percent control of The Buckeye Engine Company needed 570 shares of additional stock; that he purchased the same at various times from inactive people who did not know of the agreement between Mr. Griffiths individually and The E. W. Bliss Company for a sale of the assets of The Buckeye Engine Company; that he expressed himself as not being desirous of making a profit on this stock so purchased. According to Mr. Hopkins it was the desire of Mr. Griffiths to give a profit, if any were to accrue, to Mr. Hopkins.

The plaintiff had great confidence in Mr. Griffiths' business judgment and in consequence was willing to take the gamble or risk entailed by reason of his entering into the obligations of the contract. Had it turned out unfavorably, Mr. Hopkins could have been held to the fullest extent of his obligation under the contract. He assumed definite risks and is therefore entitled to whatever benefits accrue to him, ·if there are any.

The claim that the beneficial interest in the stock already vested in the beneficiaries of the trust prior to the execution and delivery of the plaintiff's contract, subject to be divested in case the donor revoked the trust as to the stock during his lifetime, is not in our opinion tenable. The trust agreement did not deprive Mr. Griffiths of the power of alienation. He could assign, transfer or bargain concerning same just as if there were no trust created. The effect of the trust agreement between Mr. Griffiths and The Guardian Trust Company was in effect a mere change in the form of ownership. Instead of being the legal and equitable owner of the trust funds and assets, by means of this instrument of trust, Mr. Griffiths surrendered the legal title to the trustee, but retained within himself the equitable ownership which is the real ownership, and reserving to himself the fullest right to deal with this equitable estate belonging to him, as if no trust had ever been created.

The execution and delivery of the contract imposed upon Mr. Hopkins definite obligations, and also vested in him definite rights. The trustee could do nothing more than to hold the trust ·assets subject to the directions of Mr. Griffiths, creator of the trust.

Whether or not The Guardian Trust Company knew of this contract seems to us immaterial, since the rights of innocent persons do not intervene. By reason of this contract vesting certain rights in Mr. Hopkins, the trust assets in the hands of The Guardian Trust Company became charged with such rights regardless of whether the trustee had notice of same or not.

It is further contended that the action is in effect one for specific performance and should therefore be refused because plaintiff has an adequate remedy at law. Counsel for the paintiff maintains that the case is properly in equity for an accounting as it squarely comes within the decision of **Black, Receiver v Boyd, 50 Oh St 46,** where the court said:

"The equity jurisdiction of a Court of Common Pleas in matters of mutual and complicated accounts, is not abrogated by §5130, Revised Statutes (now §11379 GC) which provides that either party may demand a jury trial of 'issues arising in actions for the recovery of money only.' An action is not one for the recovery of money only, within the purview of the statute, where, to administer full and complete relief therein, it is necessary to invoke the equity powers of the court to adjust the accounts between the parties, etc."

With this statement we do not agree, as the decision in Black, Receiver v Boyd, was expressly overruled in **Wilson Improvement Company v Malone, 78 Oh St 232.** Since the decision of Wilson Improvement Company v Malone, courts of equity in Ohio are not open to actions for accounting for ,the recovery of money unless some peculiarly equitable relief is sought, and the right to invoke the jurisdiction of equity in a suit for accounting is dependent also upon the general rules of equitable jurisdiction.

There are other reasons, however, why this action for accounting can be entertain-

ed by a court of equity. The subject matter of the contract is a trust estate and the rights of beneficiaries are involved. This alone would be sufficient to invoke the jurisdiction of a court of equity.

There is another reason. It is conceded that the stock which is the subject matter of the contract was not dealt with, in the open market and that same was held closely and was in the hands of very few people. The law is well settled that a contract relating to such stock can be specifically enforced to the same extent as land contracts can be enforced. The very execution of the contract for the sale and acquisition of such stock creates a trust relationship. The vendor in such case is theoretically deemed a trustee holding the stock for the vendee who is regarded as a beneficiary. The analogous example of a land contract proves helpful. Where two persons entered into a land contract whereby one agrees to sell and the other agrees to buy a parcel of land and the vendor in violation of the contract transfers and sells such land to an innocent person for value, the vendee may resort to an action for accounting against the vendor and require a decree of the court to account to him for such profits.

In **Goodisson v North American Securities Company, 40 Oh Ap, page 85, (10 Abs 661; 35 OLR 110; 178 NE 29)**, syllabus three reads:

"When corporate stock cannot be obtained in open market, rendering it impossible to give just compensation in damages, equity will decree specific performance to compel issuance to subscriber."

Syllabus five reads:

"Trust relationship arises by virtue of stock subscription agreement; hence corporation as trustee is bound to exercise highest degree of care for subscriber's protection."

In the opinion, on page 94, the court said:
"The fundamental reason for equitable assumption of jurisdiction in such a case as this is the same as in land contracts. In the case of a land contract the vendor is regarded in equity as a trustee holding the legal title to the land for the benefit of the vendee. If the vendor sells the land and disposes of same, there is no question that the vendee may at his election resort to an action in equity for an accounting."

By virtue of the contract of August 16th, 1920, a trust estate was created in favor of Mr. Hopkins, and he may, therefore, resort to an action for an accounting to enforce whatever rights he may have.

Our attention is directed to the consequences which would ensue a favorable holding for the plaintiff. It is claimed that such a finding would result in a destruction of the trust estate. It seems to us immaterial to consider such consequences if they are the natural outcome of a proper application of definite legal principles. In this connection it is well to point out that the beneficiaries of the trust, with the exception of two, expressly consented to and approved a judgment and finding in favor of the plaintiff granting him the relief prayed for. It is not a stretch of the imagination to conclude that these beneficiaries so consenting have full faith in Mr. Hopkins.

Miss Elsie A. Kohler, who was Secretary to Mr. Griffiths during his lifetime, and who is one of the beneficiaries under the trust instrument, is a contestant in this suit. She testified something to the effect that at the direction of Mr. Griffiths an unexecuted copy of the contract was ordered marked cancelled. This copy of the contract bearing a pencil notation of Miss Kohler bears the signature of Mrs. Griffiths, but does not bear the signature of either Mr. Hopkins or of Mr. Griffiths. This evidence is, of course, of doubtful admissibility, as on first blush it seems to be a self-serving declaration. Waiving aside the question of admissibility, it must be kept in mind that a contract entered into between parties cannot be cancelled, or its legal effect in any way destroyed by the action of one of the parties without the consent or at least acquiescence of the other contracting party.

The Attorney General of Ohio filed an answer and cross-petition opposing the plaintiff's prayer for relief and demanding that the terms of the trust be complied with. He appears under the statute in order to protect what is termed to be a "charitable trust." One of the objects named in the trust instrument was the establishment of a hospital for working men. The statement of the Attorney General seeks to protect this charitable object. It is well to observe that this charitable object, if accomplished at all, would be accomplished in the remote future. In the meantime, the funds remain in the hands of the trustee. For all practical purposes it must be conceded that it is not an object which can be reached in the near future. This charitable object and its final accomplishment must,

of course, depend in the main upon the validity and enforceability of whatever rights Mr. Hopkins may have under his contract. If any rights accrue to him it will necessarily, as a legal consequence, diminish the trust estate and thereby affect the charitable object as well as other objects of the trust. We cannot be concerned with the consequences which follow a finding in favor of the plaintiff.

Considering the facts as we find them and applying the law in the light of recognized legal principles, it is our opinion that the plaintiff is entitled to the relief he prays for.

A decree will be entered accordingly.

McGILL, J, concurs.
LIEGHLEY, PJ, dissents.

## CONCURRING OPINION

By McGILL, J.

Upon the theory that Hopkins has betrayed an intimate friendship of nearly a lifetime by seeking to enforce a cancelled or abandoned contract, a decree should be entered for defendant. To such a theory I cannot subscribe. The written contract of August 16th, 1920, is consistent with that intimate friendship, which friendship is undisputed. The contract is likewise consistent with the fact that at one time Griffiths executed a will leaving half of his entire estate to Hopkins.

It is urged that the written instrument of August 16th, 1920, is not a contract but a mere option to buy. If it is a mere option why was not the word "option" used in the written agreement? The word "option" is plain and unambiguous and is generally used when intended. If a mere option, why was any reference made to the application of the dividends? If a mere option, why was not a time limit definitely fixed within which Hopkins must exercise his rights?

If that contract was cancelled, Hopkins knew it. If it was abandoned, he must have known it, for the reason that abandonment is a matter of intention and requires an intentional relinquishment of rights. To me, it is incredible that Hopkins would wait until the death of his intimate friend and then endeavor to take advantage of the situation by seeking to enforce a contract which he knew had been cancelled or abandoned. Hopkins testified positively that there was never any suggestion of waiver or nullification of the contract.

The evidence of cancellation consists principally of the testimony of Miss Kohler who was formerly a secretary of Griffiths. She testified that Griffiths told her it was cancelled. In addition, she identified her own pencil notations of uncertain date indicating cancellation upon an unexecuted copy of the agreement. Against this testimony stands the original executed agreement and the positive testimony of Hopkins. Written agreements are not ordinarily cancelled in the manner here urged by the defendant.

The delay in seeking an accounting or settlement between the parties is explained by the fact that Griffiths desired no settlement until final liquidation of The Buckeye Engine Company which was delayed until certain tax adjustments had been made with the Federal Government. These tax claims were not in fact finally adjusted until July, 1931, some time after the death of Griffiths. Whether or not a settlement between Griffiths and Hopkins could have been made at an earlier date, is not the real question. If the parties had a bona fide belief that final liquidation of the company and an adjustment of the tax claims must first be had, or, if Griffiths desired that their settlement and accounting be postponed, until after the tax adjustment and Hopkins acquiesced, such bona fide belief or desire and acquiescence would destroy any intention to abandon the agreement.

Some question has been raised as to the propriety of or reason for the obtaining of the consent of many of the beneficiaries and particularly of the consent of Mrs. Griffiths to the decree of the court below. While defendant complained that Mrs. Griffiths was not called as a witness so that she could be cross-examined, it is significant that the defendant could have called Mrs. Griffiths but did not do so. Nor was the failure to call her accounted for in any manner. It is strongly intimated in defendants' brief that full disclosure was not made to Mrs. Griffiths. Certainly, if there is any merit in this claim, she could not be regarded as a hostile witness. This argument furnishes an additional reason why defendant as a trustee should have called Mrs. Griffiths. Her conduct, too, is consistent with the written agreement of August 16th, 1920, which she also signed.

A determination of this case depends to a considerable extent upon the weight given to the testimony of plaintiff. His testimony clearly accounts for the delay in seeking to enforce his rights, and destroys the claim of abandonment of the written agreement.

Holding these views, I am of the opinion that the Court of Common Pleas was right in finding for the plaintiff and that this court likewise should enter a decree for plaintiff.

## DISSENTING OPINION

By LIEGHLEY, PJ.

This case comes into this court on appeal from the Common Pleas Court.

The trial proceeded on an amended petition filed by the plaintiff for an accounting and equitable relief. It was alleged that on the 24th day of January, 1920, The Guardian Trust Company entered into a certain trust agreement with Edwin S. Griffiths, now deceased, and Margaret Rusk Griffiths, by the terms of which the Trust Company agreed to act as trustee of the trust estate delivered to it and all other property that might subsequently be delivered to it by them; that thereafter said Edwin S. and Margaret Rusk Griffiths, husband and wife, entered into a certain oral agreement by the terms of which they agreed to sell and he agreed to buy 570 shares of The Buckeye Engine Company stock at $350.00 per share; that included in the property deposited subsequently were 570 shares of stock of The Buckeye Engine Company, which stock was deposited in said trust in accordance with and in pursuance of the terms of said oral agreement, as evidenced by a written contract dated August 16th, 1920; that the said contract of August 16th, 1920, was executed in pursuance of said verbal agreement previously made between said Griffiths and the plaintiff, and was made in view of a certain contract executed July 16th, 1920, for the sale of the assets of The Buckeye Engine Company to The E. W. Bliss Company, for the sum of One Million Five Hundred Thousand Dollars, to be paid in five annual installments; that the United States Government at the time of making the agreement of August 16th, 1920, had claims against The Buckeye Engine Company for taxes accrued theretofore, which could not then be determined, and for that reason the value of the stock was not determinable; that for these reasons the said Griffiths desired and the plaintiff consented that the final accounting under the agreement of August 16th, 1920, should be deferred until the tax matters were settled; that the said Edwin S. Griffiths died on January 25th, 1930, before said tax matters had been finally settled and before any final accounting had been made; that in April, 1930, the taxes for 1918, 1919 and 1920 were settled for the sum of about Three Hundred Thousand Dollars; that in July 1930 further payments were made to the government for additional taxes for the years 1921 and 1925 inclusive; that no demand was ever made upon him for payment for the stock under the agreement of August 16th, 1920, but that said Griffiths made certain advancements to him; that all dividends paid on account of said stock were to be held by parties of the first part and by them applied to the purchase price of said stock; that the Trust Company has received various sums of money and shares of stock on account of said 570 shares, and that he is entitled to have the same credited on the obligations he assumed under said contract.

Plaintiff, therefore, prays that said contract entered into between Mr. and Mrs. Griffiths and himself be declared to be valid; that he be entitled to an accounting from the Trust Company of all moneys and stock received on account of said 570 shares; that said Trust Company be required to render a full accounting thereof; that the Trust Company be ordered to deliver to the plaintiff all moneys and all stock by it received to which he is entitled as a result of said accounting.

The Guardian Trust Company, trustee, filed its amended answer to said amended petition, in which it admits the execution of said trust agreement under date of January 24th, 1920, and that it is acting as trustee thereunder; admits that 570 shares of the stock of The Buckeye Engine Company were deposited with it under said trust agreement, but asserts that the same were to be administered under the terms of the trust, and then generally denies each and every allegation in said amended petition contained except as above admitted.

For its second defense said defendant says that said plaintiff was appointed co-trustee under the terms of said agreement with this defendant for and in the administration of the subject-matter of the trust, and that said co-trustee has so functioned since the death of Edwin S. Griffiths.

For its third defense said defendant alleges that if said agreement of August 16th, 1920, was ever executed and delivered by Edwin S. Griffiths, such execution and delivery were subsequent to the date when said 570 shares had been transferred to this defendant as trustee under the trust agreement of January 24th, 1920; that the disposition of said stock is governed by the terms of said trust agreement, which is inconsistent with the disposition provided

for by the contract of August 16th, 1920; that this defendant was never notified of said alleged agreement of August 16th, 1920, until after the death of said Edwin S. Griffiths; that said trust agreement was modified on September 23rd, 1921, changing the provisions for disposition of the income during life of Edwin S. Griffiths, and no mention was made of any special trust applicable to said 570 shares.

For its fourts defense this defendant alleges that it denies that said 570 shares were purchased for the benefit of plaintiff; denies that said contract of August 16th, 1920 was executed in pursuance of a prior oral agreement; denies that said Griffiths desired or requested that any final accounting under the agreement of August 16th, 1920, should be postponed until the tax matters were settled and The Buckeye Engine Company should be in a position to be fully liquidated; admits that loans were made by Edwin S. Griffiths to plaintiff, but denies that any advances were made on account of said alleged contract; denies that the dividends accruing to said stock were to be applied to said purchase price; denies that plaintiff is entitled to have any sums of money and shares of stock credited to him on said 570 shares by virtue of said agreement of August 16th, 1920.

Said defendant further avers that if the agreement set forth in plaintiff's petition was ever entered into, said agreement was subsequently abandoned by mutual consent.

Plaintiff filed a reply in which is set out in full the trust agreement of January 24th, 1920. Plaintiff therein further alleges that in the trust agreement set forth no title to nor property rights in any of the subject matter of said trust estate is vested in plaintiff, and that his powers and duties thereunder are strictly limited; that there is no power or duty therein imposed on him or assumed by him in conflict with the claims asserted in his petition herein; that he does not assert any adverse claim against the trust estate, and that the trust estate is not hereby deprived of his unbiased and impartial judgment and discretion as a co-trustee; that his duties as co-trustee do not involve his approving, disallowing, or passing upon the claims involved in this action; that he denies the allegations contained in the third and fourth defenses set forth in the amended answer of the defendant.

The Attorney General of Ohio, by virtue of §340 GC, and in compliance therewith, filed an answer alleging want of knowledge, but praying for the protection, preservation and enforcement of the charitable trust created by the terms and provisions of said trust agreement.

Under date of March 21st, 1932, the relatives, beneficiaries under the trust agreement, filed a paper writing in the case consenting that the prayer of the petition be granted. On the same day and to the same effect, the two institutions located in Wales, named as beneficiaries, filed their consent. Also, on the same day, Margaret Rusk Griffiths filed a like consent.

On August 19th, 1932, Margaret Rusk Griffiths filed a written waiver of any claim or consideration of income taxes paid with interest on her record half interest in the 570 shares which by stipulation amounted to $55,101.20.

The trial below resulted in a decree for plaintiff by which the Trust Company was ordered to deliver to plaintiff the 570 shares of The Buckeye Engine Company; Liberty Bonds to the amount of $2850; Class A. Second Preferred Bliss stock in the amount of 2325.41 shares, and The Guardian Trust Company, as trustee, was ordered to pay to The Guardian Trust Company as administrator, $53,003.46 with interest from June 1st, 1932, being income taxes paid by Edwin S. Griffiths on account of the income received on the 570 shares. The Guardian Trust Company, as trustee, was further ordered to pay to The Guardian Trust Company, administrator, the sum of $70,345.83 and interest from June 1st, 1932, in full payment of money loaned by said Edwin S. Griffiths to plaintiff. The Guardian Trust Company was further ordered to pay to plaintiff $26,274.51 with interest from June 1st, 1932, being the balance found to be due plaintiff after the discharge of the foregoing obligations as a result of said accounting. By stipulation and computation of the auditor, the plaintiff was awarded more than a half million dollars as the result of a finding by the court that plaintiff had established his alleged oral contract.

The case proceeded to trial in this court on the record, the stipulations, the transcript of the evidence, the exhibits, the pleadings above referred to and the arguments of counsel.

We deem it advisable to give a summary of the provisions of the trust agreement frequently referred to in the evidence, briefs and arguments, as follows:

Edwin Stephen Griffiths and Margaret Rusk Griffiths, husband and wife, entered into a certain trust agreement, therein called "the donors," with The Guardian Sav-

of said Trust Company on account of holdings and Trust Company, a corporation, called "the trustee" therein, on the 24th day of January, 1920.

By its terms the trustee should hold title to and in trust the property assigned, delivered, transferred and conveyed to it by the donors during the life of said donor, and thereafter, subject to the concurrence of the co-trustee, full power and authority to sell, lease, exchange, transfer, invest, reinvest, borrow money, make advancements, and generally manage and exclusively control said properties in such manner as it deems proper for the best interests of said estate.

William R. Hopkins is named co-trustee, and the trustee is directed to permit the said co-trustee the right to have an audit of all matters pertaining to said trust estate made at least annually. Said co-trustee is directed upon acceptance to designate in writing to the trustee his successor to qualify and function in his stead in the event for any reason he does not or is unable to so function.

Until the death of said donor Edwin S. Griffiths, the donors reserve the right to him at all times, (a) to have and collect, either directly or through the trustee, all incomes of said trusteed properties; (b) to direct the sale, investment and reinvestment thereof; (c) to withdraw from the operation thereof all or any part thereof; (d) to change the beneficiaries thereunder, their shares and plan of distribution to each.

After the death of donor Edwin S. Griffiths, and during the life of donor Margaret Rusk Griffiths, it is provided she shall receive annually the first Ten Thousand Dollars of income. The second Ten Thousand Dollars of income shall annually be paid to his parents, brothers, nephews, nieces and certain institutions in Wales, in such proportions as the trustee shall deem prudent to accomplish the objects specified. All income in excess of the above two annual funds of Ten Thousand Dollars each shall be paid annually to the donor Margaret Rusk Griffiths so long as she shall live.

After the death of both donors, it is provided first that his parents be taken care of and the payments to his relatives as above stipulated be continued. Next, after setting aside property sufficient to yield the income necessary to cover the above payments, the sum of Fifty Thousand Dollars shall be paid to the Ohio Masonic Home, and to this end the trustee with the approval of the co-trustee may apply a part of the principal of the trust estate. Of the remaining income, twenty-five percent shall be divided between two institutions of Wales in such proportions as the trustee and co-trustee shall determine to accomplish the purposes specified. The remainder of the income of the trust estate shall be devoted to the support of a hospital especially designed and located to serve the workers in the industrial district of the City of Cleveland with which the donor Edwin S. Griffiths was actively identified, and the trustee and co-trustee are authorized to co-operate with other donors in the establishment and operation of such a hospital, and are further authorized to contribute any part of the principal of the trust estate toward the cost of erecting and equipping buildings for such a hospital.

Some time subsequent to the execution of the foregoing trust agreement plaintiff claims that he entered into an oral agreement by the terms of which he agreed to buy, and the said Edwin S. Griffiths and Margaret Rusk Griffiths agreed to sell, 570 shares of stock of The Buckeye Engine Company to him at a price of $350 per share; that on the 16th day of August, 1920, in furtherance thereof, said Griffiths purchased 570 shares of stock for his benefit and deposited the same with The Guardian Trust Company; that on the same day in confirmation thereof a memorandum of agreement was entered into between said Edwin S. and Margaret Rusk Griffiths, in the words and figures following:

"THIS MEMORANDUM OF AGREEMENT entered into at Cleveland this 16th day of August, 1920, by and between EDWIN S. GRIFFITHS and MARGARET RUSK GRIFFITHS, First Parties, and W. R. HOPKINS, Second Party, WITNESSETH:

First Parties, in consideration of One Dollar, the receipt whereof is hereby acknowledged, and other valuable considerations, have purchased for the benefit of Second Party Five Hundred and Seventy (570) shares of the stock of the Buckeye Engine Company at the price of Three Hundred and Fifty Dollars ($350) per share and have caused said shares to be put into the name of The Guardian Savings and Trust Company with the understanding and agreement that Second Party shall have the right to pay for said stock and have the same transferred to him or to his order upon payment to said The Guardian Savings and Trust Company at the rate of $350 for each share plus interest at Six percent (6%) from this date to the time of such payment and plus also any and all charges

ing and disposing of said stock in accordance with this agreement. All dividends paid on account of said shares are to be held by First Parties and by them applied to the payment to be made therefor by the Second Party. Second Party agrees to save First Party harmless' from any and all further obligation on account of said stock and especially to pay .interest and all charges due on the same whenever the same shall accrue and to pay the entire balance due the First Parties at any time upon ——— notice of their desire to have such payment made.

IN WITNESS WHEREOF, the parties have set their names the day and year above written.

(Signed) Edwin S. Griffiths,<br>
Margaret Rusk Griffiths<br>
W. R. Hopkins."

Plaintiff further says that on the same day said Griffiths deposited said certificates of stock for 570 shares with The Guardian Trust Company and that said deposit of stock is evidenced by a certain receipt, which receipt is part of the record herein and is in the words and figures following:

"L. T. 1085.

$4,000.00 Par National Railways of Mexico Guaranteed General Mortgage 4% Seventy year Sinking Fund Redeemable Gold Bonds Nos. M-15206/209 inclusive, each for $1,000.00, due October 1, 1977, interest payable April and October 1st, and having April 1st, 1914, and subsequent coupons attached.

570 Shares Buckeye Engine Company Common Stock.

"The foregoing is an accurate schedule of the property this day assigned, transferred, delivered and conveyed to The Guardian Savings and Trust Company, to be held and disposed of pursuant to the terms of its contract in writing with Edwin Stephen Griffiths and Margaret Rusk Griffiths, dated January 24th, 1920.

"Executed in triplicate at Cleveland, Ohio, this 16th day of August, 1920.     .

(Signed) Edwin Stephen Griffiths<br>
Margaret Rusk Griffiths<br>
THE GUARDIAN SAVINGS AND TRUST COMPANY,

By A. F. Young, Assistant Secretary."

On the 23rd day of December, 1931, the said donors and trustee entered into a supplemental trust agreement by the terms of which the original trust agreement was re-affirmed in all particulars except one which related to the disposition of the income during the joint lives of the donors. The original agreement gave the right to Edwin S. Griffiths to have and collect either directly or through the trustee all incomes accruing from the subject matter hereof. This rgiht was modified in the supplemental trust agreement, and it was provided that one-half of the income should be payable to Edwin S. Griffiths and the other one-half to Margaret Rusk Griffiths. This supplemental agreement revoked during the joint lives of the donors only the original provision in respect to income, and this provision was stipulated to be irrevocable and bnding upon all of the interested parties. It further provided that the supplemental agreement should cease and terminate upon the death of either of the donors, and the provisions of the original agreement were in all respects ratified and confirmed.

It is worthy of note that the plaintiff was not mentioned in this supplemental agreement, nor is the shbject of a special deposit with the trustee referred to or recognized in any manner. It is further worthy of note that under the provisions of the original agreement all property was assigned, transferred and conveyed to the trustee to be held by said trustee in trust subject to the specific limitations, powers and regulations of the said agreement, and to be withdrawn by the sole act and election of said Edwin S. Griffiths. It is further to be noted that under the language used in the receipt given by the trustee to Griffiths, it is provided that the 570 shares are to be held and disposed of pursuant to the terms of its original contract of January 24th, 1920. Nowhere in the written documents above referred to is there any notice or recognition of a special deposit with the trustee unless same may be inferred from the language in the alleged contract of August 16th, 1920.

Citation of authority is unnecessary in support of the proposition that a prior oral agreement is merged into a subsequent written agreement, if the written agreement is co-extensive with the alleged oral agreement in its essential particulars and expresses the same essential terms. If the oral agreement conflicts with the subsequent written contract, the latter prevails. If the oral agreement is a contract different in terms, the later written agreement is presumed to express the contract finally agreed upon.

Plaintiff claims a simple parol contract of sale and purchase of stock. The written

contract executed thereafter on August 16th, 1920, recites that Griffiths has purchased said stock for the benefit of Hopkins and has caused the same to be deposited with the Guardian with the understanding and agreement that Hopkins shall have the right to pay for same and have same transferred to himself when he pays for it as therein stipulated with the reservation to the vendor to require payment upon blank days or months notice, and any dividends accruing in the meantime shall be credited on the purchase price. In what respect is this paper writing any more than an option? The plaintiff doubtless regards this as part of the mechanics used in carrying out the oral contract.

We come now to the oral proof in the case. A summary of the material facts testified to follows. Reciting same contributes to extending this opinion to unusual length. However, this is not written for the primary purpose of publication, but for the purpose of fully stating and explaining the reasons for the views we entertain for the benefit of any interested party.

The plaintiff first offered himself as a witness to sustain his claim.

He testified that he was acquainted with Edwin S. Griffiths since 1895 and that from that date to his death they were intimate friends; that he organized The Cleveland Machine Company, in which company he helped Griffiths to buy an interest, and from that date until his death he was his personal attorney; that Griffiths sent for him to come to Florida during his last illness.

He testified concerning the trust agreement of January 24th, 1920, by the terms of which the Guardian became trustee of nearly all of his property, and that Griffiths caused the Guardian to put his name in as co-trustee.

That during the latter part of the year 1920 Griffiths and himself made a trip to Europe on account of his ill health. Griffiths thought he would never return. On the boat he insisted that written instructions to the Guardian be prepared, which were written by plaintiff in long-hand and witnessed by Carlos Newman, and by him mailed to the Guardian, (Newman was not called to testify) and by its terms the income of the estate was left to Mrs. Griffiths and plaintiff.

That on account of his ill health and because he had been a successful competitor of The Bliss Company, Griffiths tried to sell his companies to The Bliss Company during the early part of 1920; that they did not want to buy The Buckeye Engine Company, but Griffiths insisted and he and Mrs. Pinney went to Brooklyn; that during the conference Griffiths took sick and wired for the witness to come to Brooklyn and from then on he had charge of the deal; that the final terms agreed upon provided for the payment of sixty percent in second preferred stock of The Bliss Company and forty percent in cash.

That Griffiths had personally obligated himself to see that the stockholders approved the sale; that Griffiths and his wife owned sixty percent of the stock, and that plaintiff told Griffiths that in order to prevent any successful blocking of the deal it was necessary for him to own seventy-five percent of the stock; that he said he wanted to buy out certain stockholders; that the witness said to him that he would like to have a chance to buy the stock, and Griffiths replied that he should leave that to him, that he would attend to it; that nothing more was said until August 16th, 1920, when he asked me to draw a contract as it was drawn, in which he agreed to account for the profits, if any, and plaintiff agreed to bear the loss, if any, with the right on his part to pay up on that basis, and the right on their part to require me to pay it; that the contract was thus prepared and three copies were delivered to him; that he later came back with the copies signed by Mrs. Griffiths, and there at my desk he signed two copies and plaintiff signed one and handed it back to him. Plaintiff does not remember what was then said, but he got the impression that it was his intention to go at once to the Guardian and deposit the contract; that he understood that the Guardian was to be a definite party to it, and as he agreed to pay charges for the transaction; that plaintiff then turned the copy over to his secretary, Mrs. Murman; that when Griffiths brought back these copies he brought back the receipt of the Guardian for the 570 shares of Buckeye Engine Company common stock.

That he and Griffiths had talks about the income taxes, and that Griffiths thought by taking payment for the Buckeye Company in installments running to 1925, they could keep the taxes out of the higher brackets; that the government was also making demands for years prior to 1920; that the final payments for taxes on 1918, 1919 and 1920 were not made until April 1st, 1930, and the taxes on 1922 to 1925 were not settled until July 1931; that the payment of the taxes was required in order to fix the amount of dividends from the

Buckeye, and the whole question of profit and loss depended upon the amount of taxes; that Griffiths died January 25th, 1930.

That from August 16th, 1920 to his death, whenever they met invariably they talked of the taxes and his worry over the result and outcome of it all; that when the witness was asked about what was said about the time of carrying out the contract, he stated that what was said Griffiths said, as he never pressed it; that on several occasions when the witness required money Griffiths provided it; that he was perfectly content to let Griffiths handle the matter; that neither Griffiths nor Mrs. Griffiths notified him to take up the stock, nor did anyone request it, nor did anyone say anything about the contract being waived or invalid; that he was content to let it in the hands of his friend as he would handle it properly.

On cross-examination he stated that he understood he should have the right to take up the stock at any time and that Griffiths had the right on reasonable notice to make him take it out at any time; that he drew the original trust agreement, but did not see it as signed until after his death; that Mr. Rusk did the income tax work.

That he assumed that the stock from The Bliss Company would be distributed as dividends and that he learned after the death of Griffiths that the stock was so distributed; that Griffiths may have told him about it, but the ransacion was carried out in his own way and whatever he did was all right to plaintiff; that Griffiths feared the taxes would consume a lot of the value of the stock and he was holding the whole thing intact.

That plaintiff knew that dividends were paid right along on the Bliss preferred and that all accruals on the 570 shares should be credited which Griffiths or the Trust Company received on the stock, that is, on the purchase price of the stock; that everything that came to that 570 shares should apply on it, and that if that was not enough plaintiff should make up the balance, and if there was anything left, he should get it; that this was not discussed, but it was his understanding; that there was no discussion as to when the dividends should be applied, but he understood the cash and the stock were to be credited at once; that the settlement with the government was on the basis of seventy percent of par for the Bliss stock; that it never occurred to him to cover the matter of stock dividends in the language of the contract.

That he never showed this contract of August 16th, 1920, to the Guardian until after the death of Griffiths, and that he never made any income tax return on the 570 shares; that it was his understanding with Griffiths that the matter should stand until there was a settlement with the government, and plaintiff trusted it all to him; that when asked what bearing the taxes had on his right to withdraw the stock when it was paid for, plaintiff stated he did not know when it was paid for, and did not inquire about it, and that he left it all to Griffiths, and that it is doubtful if he ever figured their standing until after his death; that he was unable to say on what date the stock was fully paid for.

That Griffiths had made advances to him in substantial amounts, but he never figured it out as it was safe in his hands; that aside from the contract he owed Griffiths $55,700 plus interest; that there was a loan of $15,000 on March 24th, 1919, and thereafter other items; that he never kept up the interest as they had an understanding on that subject.

That on March 3rd, 1930, he received a letter from the Guardian as administrator regarding this debt to Griffiths; that there was no occasion to show the contract of August 16th, 1920, to the Guardian until after the demand of the Guardian for payment; that he answered that letter on March 13th, 1930, admitting all or the major portion of said debt and claiming the excess profits from dividends in excess of the 570 shares at $350 per share, and that he told them he would adjust at the first convenient moment and reimburse the estate out of the trust fund; that he had figured enough to know that there was money coming to him over and above the $55,700 owed by him; that he saw the estimate of the taxes paid by Mr. and Mrs. Griffiths about a year ago, and the amount looked excessive to him and he wanted to have it checked.

That the tax claims affected the settlement because the dividends were to go into the account and until those were sufficient to wipe it out, nothing could clearly be determined; that even if the dividends fully paid for the stock by July 1926, nevertheless the tax claims would still affect the settlement; that he could have called for the stock when the dividends equaled $199,500 provided he repaid his debt to Griffiths and the taxes; that he knows there is nothing in the contract about his debts to Griffiths, but we were two close friends; that he

knew he was entitled to the stock when paid for plus my indebtedness to him and plus taxes; that the question of my right to get the stock when the dividends paid for the same never occurred to him; that the statement was made to him by Griffiths that he was not entitled to make settlement on account of the profits until they were certain what the profits were and that this could not be decided until the taxes were settled although there was nothing in the contract about it.

That he paid little or no interest on the loans because it was all to be worked out together between friends; that the dividends were to be applied to the stock and the balance paid to me.

That he received $11,850, with $813 expense money for his services in the matter of the sale to The Bliss Company; that he gave plaintiff $15,000 in 1927, without a note; that plaintiff told him he needed it for a matter which Griffiths understood and plaintiff asked him if he could have it on the account, and he said "Yes"; that it was all under plaintiff's rights under this contract, as there was no other account.

That there never was any talk with plaintiff about cancelling the contract of August 16th, 1920; that Mrs. Griffiths asked for a form of consent to a judgment for plaintiff, and he took it to her; that she wrote to the bank and said that she wanted this agreement carried out; that she changed her mind once and then changed it back again.

Plaintiff called Stephen G. Rusk, brother of Mrs. Griffiths, who testified that he was connected with many of the enterprises of Mr. Griffiths; that he regularly audited the books of The Buckeye Engine Company and The Cleveland Machinery Manufacturing Company from 1917 to a very recent date, and had full charge of the tax situation; that the negotiations over the excess profits taxes extended from 1924 to 1930; that he prepared the income tax returns for Mr. and Mrs. Griffiths for the years 1920 to 1929 inclusive; that the income taxes paid by them on the 570 shares of Buckeye included by them in their reports amounted to $73,770.80; that Mr. Griffiths never at any time said anything to him about Hopkins having any interest in any Buckeye Engine stock which stood in his name or the name of the Trust Company; that Mr. Griffiths was never anxious to pay income taxes he should not pay, and he would say that if such a contract had existed he would have deducted the income taxes thereon for the reason that he always entered the high-er brackets in his return and would have saved money thereby.

To further sustain his claim plaintiff called Mr. R. S. Newcomb to testify, who said that he was a partner of Hopkins in 1899 and then met Griffiths, who was at the office quite frequently; that the friendly relationship existing between Hopkins and Griffiths continued to his death.

Mrs. Pearl Murman testified that she began work with Mr. Hopkins in 1903 and continued with him for twenty years; that she was working for him in 1920 and then typed the contract of August 16th, 1920; that she put it in an envelope and marked it and placed it in the vault in Mr. Hopkins name, where it remained as long as she was there.

The plaintiff also offered Mr. H. A. Greiner, who testified that he was Treasurer of The Buckeye Engine Company since April 1st, 1911; that the sale to The Bliss Company was agreed upon before he knew much about it, but he did learn of it after the terms were agreed upon; that Mr. Griffiths handled the transaction; that Mr. Griffiths told him one day that he had a chance to sell which was satisfactory to him; that thereafter Mr. Griffiths called him about an appraisal which he took to New York; that during the year next preceding the date of the sale Mr. Griffiths had bought out the stockholders that were dissatisfied, at the rate of $350 per share; that at the time the witness talked to other stockholders and told them he did not know what the government would do on the question of taxes and advised them that they had better take the offer; that he was going to keep his stock for the reason that he had a job; that he knew Griffiths well; that Mr. Griffiths never at any time said a word to him about a contract with Hopkins in relation to 570 shares of Buckeye stock.

The foregoing were all the witnesses called by plaintiff to sustain his claims and the substance of their testimony. The witnesses offered by the defense follow.

Mr. C. H. Force, a Vice President of The Guardian Trust Company, was called on behalf of defendant and testified that he knew Griffiths well and looked after his personal financial affairs; that Griffiths often placed his property in his name and never took any writing for it; that he held a mortgage in his name for Griffiths for $150,000 on Florida land, a mortgage on property at Oakwood on the Lake, stock certificates in large number so he could represent him on the boards of directors of

his companies; that they had close social relations; that he stayed at his house quite a number of times, visited him in Florida at his home and at his hotel; that Griffiths never said anything to him about having a contract with Mr. Hopkins for 570 shares of Buckeye stock; that he first learned of this contract on March 10th, 1930, when Mr. Hopkins called at his office in respect to a letter received by him from Mr. Emmick making claim in behalf of the estate for the amount owed by Hopkins thereto; that he told Hopkins that he knew nothing about it; that Hopkins then exhibited the contract and left it with the witness, and he made a copy of it and sent a copy to Miss Kohler in Florida and requested information from her about it; that the only talk he ever had with Hopkins in regard to this contract was when he exhibited it to him in March, 1930, and he told Hopkins then that he had never seen it and never known of it, and that it had never been in the Guardian to his knowledge.

Elsie A. Kohler was called and testified that she met Mr. Griffiths in 1902 when she started to work for The Cleveland Machinery Company and was with them until the liquidation in 1931; that Mr. Griffiths was Secretary at first, and then General Manager and then President; that she did all his personal work and saw his private books and records of his property and income; that she was authorized to sign his name to his checks on his personal bank account; that there was a record in his books of the property deposited with the Guardian as trustee, under the trust agreement of January 24th, 1920. A copy of the pages tabulating said properties was identified and admitted in evidence, which record contains entries of income received on the Buckeye stock placed in that trust. That never during his leftime did she see a copy of the contract of August 16th, 1920, signed by either Hopkins or Griffiths, nor did she find one after his death; that there were two carbon copies signed by Mrs. Griffiths that she saw when he told her to file them in his personal file shortly after they were drawn up; that several years thereafter he went through his files to weed out old correspondence, and when the witness came across this carbon and called his attention to it, he said it was cancelled and then I marked it "Cancelled per E.S.G.", which is admitted in evidence as an exhibit.

That his personal ledger shows the loans to Hopkins, a copy of which was admitted; that his books show two interest payments only outside of the trust, being $50 March 1st, 1918 and $180 April 21st, 1921; that Mr. Griffiths commented several times about this indebtedness of Hopkins to him and never referred to any offsetting claim that Hopkins might have; that she is a beneficiary of $3600 to $5000 per annum.

Mr. A. F. Young, Vice President of The Guardian Trust Company, was called on behalf of the defendant, who identified the receipt for 570 shares of Buckeye stock on August 16th, 1920, the original of which is a part of the file; that at the time this was signed, Griffiths said nothing about a contract with Hopkins in respect to the 570 shares; that Griffiths never said anything then nor at any time during his life about such a contract; that he saw this contract of August 16th, 1920, in 1930; that Hopkins never said anything about it while Griffiths lived; that the trust agreement of January 24th, 1920, was amended December 23rd, 1921; that Griffiths never revoked the trust, but did withdraw fifty shares of Buckeye stock on January 21st, 1924, but did not allocate it to any block of stock; that the present net value of the estate is from $80,000 to $178,000, dependent upon state and inheritance taxes.

On cross-examination he testified that Hopkins never talked to him about the estate before the death of Griffiths; that Griffiths was a man able to run his own business and did not discuss his business freely with him, but that Griffiths was very much closer to other officers of the bank; that Mr. Force practically handled everything for Mr. Griffiths.

That the receipt dated August 16th, 1920, states that the 570 shares are to be administered under the terms of the trust; that Mr. and Mrs. Griffiths had power of revocation and right of withdrawal and could contract as they saw fit.

Mr. R. R. Emmick, Assistant Secretary of the Guardian Bank, testified that the Guardian is administrator of the estate of Edwin S. Griffiths; that there was no copy of the contract of August 16th, 1920, among his papers; that the record showed that Hopkins was indebted to Griffiths, and for that reason he wrote to Hopkins on March 3rd, 1930, as the supervision of the estate had been placed in his hands; that he first heard of the claim of Hopkins on the 13th of March, 1930, by his letter in reply to the one of March 3rd; that he then made a search for the contract and found two copies signed by Mrs. Griffiths; that these were found by Miss Kohler and had the pencil notation in the corner "Cancelled per E.S.G."

That under the terms of the contract as claimed by Hopkins the 570 shares of stock would have been paid for by June 18th, 1926, plus $11,430.19 due Hopkins, and if the Liberty Bonds and stock dividends were applied upon the payment the 570 shares were paid' for in full on the 12th day of January, 1925, plus $3693.87 to Hopkins; that these computations do not take into account the $57,000 owing by Hopkins, nor the income tax paid on the 570 shares by Mr. and Mrs. Griffiths; that notices or statements were furnished to Hopkins during the first year that the Guardian was a trustee, but that these were stopped by Griffiths later.

The defense then offered as a witness Harry H. Pinney, who states that he knew Griffiths since 1916; that his first business with him consisted of buying two million dollars worth of machinery from him; that Griffiths came to him in Cincinnati in 1919 and stated that he was ill and wanted to go away a year or more and wanted him to take charge of his business; that he finally consented to do so and came to Cleveland and became Vice President of his companies and operated them during his absence, which companies were The Bishop and Babcock Company, The Cleveland Machine Company and The Buckeye Engine Company; that he had full charge; that he opened negotiations with The Bliss Company by a letter to a Mr. Mackay in May, 1920; that he had conducted the negotiations and had progressed to the point when a price was named; that Mr. Griffiths took sick at a meeting in New' York; that Mr. Hopkins had prior thereto shown the plants to Mr. Mackay and Mr. Page at his request; that he advised Mr. Griffiths to sell on account of possible impending panic.

That he never heard of a contract with Hopkins by Griffiths in regard to the 570 shares of Buckeye stock until three or four months ago.

On cross-examination he says that he was very close to Mr. Griffiths and that he knew that Mr. Hopkins and Mr. Griffiths were close friends; that when Mr. Griffiths became ill he suggested that Hopkins be called in as he knew that Mr. Griffiths had confidence in him; that Hopkins took care of the legal end and he conducted the negotiations; that he was acquainted with the Bliss Company before and that it was a huge corporation.

The above and foregoing constituted the substantive and material proof in the case, and coupled with the admissions, stipulations, consents, waivers and exhibits herein referred to, embrace all that is deemed necessary to be mentioned in reaching our conclusions.

The plaintiff claims an oral contract of sale and purchase prior to August 16th, 1920. The proof is that he told Griffiths that ownership of seventy-five percent of the stock was necessary to prevent any blocking of the sale of The Buckeye to The Bliss Company. Griffiths said he would buy the stock. Hopkins told him he would like a chance to buy. Griffiths said he should leave that to him and he would attend to it. Hopkins says nothing more was said until August 16th, 1920, when Griffiths asked him to draw a contract as it was drawn. This is all the proof of an oral contract. No price and no quantity were mentioned. Hopkins bid for a chance to buy and Griffiths said leave it to me. The claimed oral contract was not proven.

Plaintiff claims the written memorandum executed by Griffiths and wife and himself on the 16th day of August, 1920, is a contract in such comprehensive terms as warrants and justifies full recovery. By its terms Griffiths says we purchased 570 shares for your benefit at $350.00 per share and placed same in the name of the Guardian with the understanding that you have the right to pay for same and have same transferred to you when you pay $350.00 per share plus interest and charges. Hopkins agrees to save Griffiths harmless on account thereof, to pay interest and charges when due and to pay the entire balance due at any time upon (reasonable) notice from Griffiths so to do.

Is this a binding contract for the sale and purchase of this stock? Or, is it a mere option requiring some act, some performance on the part of one or both parties to ripen it into a binding contract. Griffiths gave Hopkins the right to pay for and thereby possess and own said stock. Griffiths lived almost ten years thereafter, but during all that time Hopkins paid not a cent. Hopkins agreed to pay for same upon reasonable notice to pay. Griffiths never gave the notice. Without either payment or demand for payment during his lifetime, is there a contract?

This case must be decided on the proof in the case. The plaintiff has the burden of establishing a contract in the first instance as a prerequisite to any right of recovery of anything. The testimony of the plaintiff is uncorroborated and unsupported except to the extent that this paper writing lends corroboration. Of course, this document was executed and the witnesses testi-

fying in respect thereto practically agree.

If the language of the paper writing is considered in the light of the conduct of the parties thereto in respect thereto over the entire period from the date of its execution to the time of the death of Griffiths, the irresistible conclusions can not be avoided that both Hopkins and Griffiths at all times regarded and treated it as an option, "a chance to buy", which was ignored and abandoned but a few years after it was signed.

What was the conduct of Hopkins in respect thereto? The document gave Hopkins a chance to buy. He knew of the trust and its terms in the Guardian, as he drew the paper. From the receipt of the Guardian, he knew August 16th, 1920, that this stock had been placed in this trust and not into any special deposit. Being personal counsel for Griffiths, he had reason to know that this right to buy was accorded in response to his prior request. On the day the paper was signed, he gave his copy to his secretary who filed it, and from that day forward it is never heard of again until after the death of Griffiths. He talked to no one about it, except he says he often talked with Griffiths about it.

Hopkins wrote instructions to the Guardian in the fall of 1920 at the request of Griffiths while on board a boat enroute to Europe, and no mention was made of this contract or any special deposit of stock thereunder.

Hopkins knew that Griffiths modified his trust agreement in December, 1921, in respect to the income during his life, and in all other respects ratified and confirmed the former provisions, and did not mention this contract or any special deposit of stock in the trust. He now claims right and title to this stock under this contract but asserted none then and registered no protest and made no demand that this stock be earmarked or identified.

Moneys passed from Griffiths to Hopkins at different times from 1919 to 1927. He claims payments since August 16th, 1920, were advances on account. Griffiths carried the items on his books as loans. This stock was paid for by Bliss stock and cash dividends in January 1925. If Hopkins really believed in 1927 when he needed $15,000 that he was then a party to a binding contract for 570 shares of stock for which he was obligated to the amount of $199,500, it is difficult to believe that he would fail to check or demand a statement reflecting the condition of this stock account under this contract. An investment of $200,000 is large enough to arouse the interest and receive the constant attention of the ordinary business man. Inquiry would have disclosed to him then that the 570 shares were paid for with a handsome surplus in addition coming to him. The need for a loan would have been amply supplied from this source.

But it is now claimed that the pendency of income tax claims prevented computation and accounting then, and during all the period from 1920 to 1930, although Rusk says negotiations did not begin until 1924. He now claims that Griffiths desired the matter of accounting deferred until after settlement. The reason for this is difficult to understand. Griffiths was a shrewd business man and plaintiff a lawyer.

If, as claimed, this document of August 20th, 1920, is a binding contract of sale and purchase, then the respective rights of the parties are fixed. If title to the stock passed that day, Hopkins had to pay the income taxes in any event as well as the purchase price, whatever the amount might be. No accounting would vary this contract. The decree below obligates him to pay these taxes. Hopkins never made a return of income and never paid the tax.

Hopkins was attorney for Griffiths and his Companies. Greiner was treasurer of Buckeye during all these years. Pinney was Vice-President and operated his Companies, and engineered the sale to Bliss. Hopkins took care of the legal end. Their work would bring them into intimate contact. The ownership of the stock of the company would naturally be discussed. Yet these men never heard of this contract.

Hopkins made no payment to Griffiths on this stock. He never demanded the stock. He never notified the Guardian that he held a contract. It remained untalked of and buried until the lips of Griffiths were sealed in death. Not until the Guardian demanded that he pay his loans amounting to $55,700 was this contract resurrected and rights attempted to be asserted under it.

What was the conduct of Griffiths in respect thereto? Griffiths placed almost all his property in a living trust with the Guardian in January 1920. Hopkins drafted the original trust agreement, and by and from its terms both knew that property once deposited thereunder could not be lifted therefrom except by and through the express wish and act of Griffiths under the withdrawal powers reserved. This 570 share lot was specifically deposited in the trust and to be governed by its provisions

by the express language of the Guardian receipt therefor dated August 20th, 1920. Griffiths sent written instructions to the Guardian in October 1920 when enroute to Europe. He had this trust under serious consideration again in December 1921, when he modified the income feature thereof. On neither occasion did he withdraw this stock or establish a special deposit or allude to this alleged contract. And Hopkins knew all about these conditions and urged no record recognition of any contract to sell. These acts can be reconciled with an option to buy, with a "chance to buy," and are in conflict with the claimed contract to purchase and sell.

Griffiths paid some $77,000 in income taxes on this stock, which with interest amounted to over $100,000 in 1932. Rusk, called by plaintiff, says Griffiths was not keen to pay any more taxes than legally required. If Griffiths had considered that this stock was bound up in any contract whereby Hopkins was the owner at any time during his life, he would have and should have insisted that Hopkins return same to the Government. It would have kept his return in lower brackets and he would have saved money by this truthful return, even if Hopkins made further loans to pay the taxes.

Hopkins was never charged on his books for this stock. This stock on his books was scheduled with the properties deposited in the trust. Hopkins was charged with all moneys borrowed in a loan account. His books at no time reflected this alleged contract nor any special deposit nor charge to Hopkins for income tax paid in his behalf. If ownership of this stock had ever been considered to be in Hopkins by Griffiths, his books would somehow so reveal his understanding. His books are in harmony with an option to buy and not with a contract to sell.

Griffiths filed copies of this contract signed by his wife. Several years after in going through his files, Miss Kohler, his secretary for many years, ran across one and showed it to Griffiths, who stated that it was cancelled. She marked it "Cancelled per E.S.G." and replaced it. It was found among his effects, identified by Miss Kohler and received in evidence.

No original copy was found among his effects. Neither he nor Hopkins advised the Guardian that either had entered into such a contract, although it involved and affected the trust estate, if it be a contract of sale. He did not tell Rusk, who was his brother-in-law and invested in and was intimately acquainted with his properties and took care of all of his income tax matters for years. He never told Greiner, Treasurer of Buckeye for years. He never mentioned it to Pinney in whom he had such confidence that he placed the operation of his companies in his charge. Pinney negotiated the sale to Bliss, the details of which would naturally comprehend the ownership of stock, but this alleged contract was not mentioned. Mr. Force, Vice-President of the Guardian, was his trusted financial adviser and confidant, in whose name Griffiths owned valued and various properties. He never referred to such a contract with Hopkins in his dealings with Force or any other officer of the bank.

From 1920 to his death neither party mentioned this alleged contract. Neither left a word in writing after the date the paper was signed. If a binding contract for about $200,000 had been in existence and outstanding, some record of it would exist and someone would have heard of it in the normal course of human events. It is only upon the theory that both had abandoned it and regarded it as worthless that the circumstances and fact of silence in respect thereto can be explained.

Further facts and circumstances of similar import might be detailed. If done, like the foregoing, all could be reconciled upon one theory only. Plaintiff requested an opportunity to buy and own some Buckeye stock. Griffiths gave him a memorandum to that effect August 16th, 1920. He did not take any steps to exercise the option. After the lapse of some time, the conduct of both parties is consonant only with an agreement and decision, express or implied, to ignore and abandon the option.

The record may be searched with greatest scrutiny with the result that Griffiths left not a word about a contract of sale or an accounting after this paper writing of August 16th, 1920, excepting his declaration to Miss Kohler a few years later that it was cancelled and excepting the words that plaintiff puts in his mouth during the trial below, which took place long after his death.

The proof fails to establish the alleged oral contract. The proof fails to establish that the memorandum of August 16th 1920, is a contract of sale, but on the contrary the overwhelming weight of the evidence, the conduct of the parties in respect thereto over a period of years, compels the conclusion that it was regarded and treated by them as a mere

option and eventually abandoned. The plaintiff has failed to make his case by a preponderance of the evidence.

Our attention was challenged to the fact that if the plaintiff should prevail there would remain in the estate due to the depression less than $200,000. While this fact could not be controlling, it is worthy of note in view of the objects sought to be accomplished by the donor with the bulk of his estate.

Edwin S. Griffiths is dead. His version of this affair is not available. The right of plaintiff to testify with the widest latitude was not questioned. The cherished hopes and laudable results designed by Griffiths to be accomplished by dedicating the bulk of his estate to specific charitable uses must be gathered from his records. His trust agreement remains without change in this respect from the date of execution to this day as a lucid and legal expression of the donor's will.

The waiver of any claim on account of income taxes by the widow (who was not called to testify), her consent to the prayer of the petition, the consent of the parents, nephews and nieces, the consent of the institutions in Wales, all beneficiaries, leaving only the State representing the charitable trust, are vehemently urged upon us as so far controlling and so effectually changing the equities in this lawsuit that there remains no good reason for denying the prayer of the petition. It is said in effect if all the beneficiaries consent except the unestablished charitable institution, the court ought to grant the relief prayed for.

The record does not disclose what motive or inducement impelled these beneficiaries to be willing to forego real dollars in favor of an unrelated friend of the deceased donor and for that reason we withhold speculation and comment.

But it must be remembered that courts of equity have a solemn duty and responsibility in the premises. The donor impressed a trust for charitable uses upon the major portion of his estate. The jurisdiction of a court of equity has been invoked. It is the duty of the court to so construe a charitable trust as will tend to preserve, protect and enforce the trust rather than destroy it. Its destruction should not be permitted by means of connivance, indifference or by common consent of individual beneficiaries. A most liberal construction should be given to such gifts, as was stated

by Judge Ranney in **Landis v Wooden, 1 Oh St 160.** Also, see **Palmer v Wiler, Exr., 102 Oh St 271. Gearhart v Richardson, 109 Oh St 419.**